IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Aircraft Gear Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18 C 50244 |
| | ) | |
| vs. | ) | |
| | ) | |
| Daniel Lentsch, et al., | ) | Judge Philip G. Reinhard |
| | ) | |
| Defendant. | ) | |

### ORDER

**Pursuant to 18 U.S.C. § 1835(a), in order to preserve the confidentiality of trade secrets, the original opinion was filed under seal. This is the redacted version.**

For the foregoing reasons, plaintiff's motion [160] for partial summary judgment is denied. Defendants' motion [165] for summary judgment is granted in part and denied in part. Plaintiff has abandoned its claims under the state law tort theories set forth in Counts V, VI, VII, and VIII and summary judgment is granted in defendants' favor on plaintiff's claims under those tort theories. Defendants' motion is granted as set forth in the opinion as to two of plaintiff's claimed trade secrets and denied as to plaintiff's other claimed trade secrets. Defendants' motion as to plaintiff's breach of contract claim is denied. The parties are directed to confer and jointly propose redactions to this opinion by October 12, 2022. The parties are directed to consult with Magistrate Judge Jensen concerning potential settlement of this case and case No. 22 C 50048, Amalga Composites v. Aircraft Gear Corp. The court acknowledges prior settlement efforts, but new efforts may be fruitful due to the change in posture of this case.

### STATEMENT-OPINION

Plaintiff, Aircraft Gear Corporation, brings this action against defendants, Daniel Lentsch, Amalga Composites, Inc. ("Amalga"), and Composite Drivelines LLC ("Composite"). Plaintiff claims Lentsch unlawfully took property from plaintiff which he obtained during his employment with plaintiff and used that property for his own benefit (including by giving it to others to use for their benefit.) Plaintiff claims Amalga and Composite received the property Lentsch unlawfully took from plaintiff and used that property for their own benefit. Plaintiff claims these actions by Lentsch, Amalga, and Composite caused injury to plaintiff for which plaintiff is entitled to relief in the form of damages and injunctive relief. These claims are set out in plaintiff's third amended complaint ("TAC") [91].

The TAC alleges these actions by defendants constituted misappropriation of plaintiff's trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1831 et seq. ("DTSA") (Count I) and the Illinois Trade Secrets Act, 765 ILCS 1065/1 et seq. ("ITSA") (Count II). The TAC further alleges, in Counts III and IV, that Lentsch's actions were also a breach of his

1

employment agreement with plaintiff.[1] The court has subject matter jurisdiction pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1367. The parties have filed cross-motions for summary judgment [160] [165]. Plaintiff's motion [160] seeks summary judgment that, under the DTSA and ITSA violation theories, defendants are liable to plaintiff as a matter of law for the misappropriation of two of plaintiff's claimed trade secrets. Defendants' motion [165] seeks summary judgment that plaintiff is not entitled to relief on its claims against defendants under any legal theory.

Plaintiff designs, manufactures, and sells constant velocity joints ("CV joints") for motor vehicles. It designs, manufactures, and sells a particular line of high-performance CV joints ("RCV Performance Products" or "RCV Performance CV Joints") for off-road and performance vehicles. Lentsch worked for plaintiff as a product development engineer from January 2010 to August 2012. His job duties included the design and development of CV joints. He had no prior work experience with CV joints and took no coursework regarding CV joints while studying mechanical engineering. After leaving plaintiff, Lentsch worked for Erik Buell Racing & Hero MotorCorp and Robert Bosch LLC. During the five years he was employed by these companies after leaving plaintiff, he did not design or otherwise work with CV joints. In addition to his employment with Robert Bosch LLC, Lentsch also began doing freelance design work.

In August 2017, Amalga and Composite jointly began working on the design of a driveshaft assembly for the Dodge Demon Project.[2] The Dodge Demon Project was a Chrysler project for the design of a driveshaft assembly—including a driveshaft attached to a CV joint—for Chrysler's Dodge Demon, a high-performance vehicle. Chrysler provided Amalga and Composite with specifications and project parameters for the Dodge Demon Project. When they undertook the Dodge Demon Project, neither Amalga or Composite had experience or expertise regarding the design of a CV joint. They sought quotes from several CV joint manufacturers, including plaintiff, for the design and/or production of a CV joint for the Dodge Demon Project. On September 29, 2017, plaintiff provided a quote to supply a minimum of 25 CV joints for the Dodge Demon Project of $1060 per unit. Amalga did not accept this quote. On December 7, 2017, Amalga asked Lentsch if he would assist with the design of a plunging CV joint for the Dodge Demon Project.

Amalga asked Lentsch to design the CV joint because it knew he had worked at plaintiff previously and was knowledgeable regarding CV joint design. Lentsch emailed Amalga a copy of his preliminary CV joint part drawings on January 8, 2018, and a revised version of the drawings on January 29, 2018. These five drawings are referred to by the parties as the "Five Part Drawings". Lentsch billed Amalga for ten hours of work to design the CV joint (2 hours for

---

[1] The TAC also alleged several tort theories of recovery against defendants: breach of fiduciary duty against Lentsch (Count V); aiding and abetting a breach of fiduciary duty (Count VI) and tortious interference with a contract (Count VII) against Amalga and Composite; and conspiracy against all defendants (Count VIII). In its response to defendants' motion for summary judgment, plaintiff states that it "voluntarily dismisses Counts V-VIII." Dkt # 196, p. 5. The court takes plaintiff to mean that plaintiff is no longer advancing any of these tort theories in support of its claims for relief.

[2] Plaintiff alleges Amalga and Composite have joint ownership.

2

the outer race, 2 hours for the inner race, 2 hours for the cage, and four hours for assembly and design verification).

Amalga sent the Five Part Drawings to plaintiff to see if it could create a prototype CV joint from the Five Part Drawings. When plaintiff received the Five Part Drawings from Amalga on April 27, 2018, plaintiff notified Amalga that the Five Part Drawings contained plaintiff's trade secrets and Amalga notified plaintiff that Lentsch had prepared the drawings. Representatives of plaintiff and Amalga met on May 7, 2018, to discuss plaintiff's claim that the Five Part Drawings contained plaintiff's trade secrets. Following the meeting, Amalga notified plaintiff that Amalga intended to move forward with development of the CV joint depicted in the Five Part Drawings.

Amalga sent the Five Part Drawings to [manufacturer] to create a prototype from the Five Part Drawings. [Manufacturer] asked to, and did, change [a factor] to a [different factor] than was contained in the Five Part Drawings because the [original factor] was too [difficult] to meet. Amalga asked Neapco to test the prototype. The prototype failed prematurely and did not pass the testing.

The Five Part Drawings contain the following items which plaintiff claims are plaintiff's trade secrets: [redacted]. It also claims defendants misappropriated certain "combination" trade secrets (things that are trade secrets when used in combination with one or more of the "stand alone" trade secrets). The "combination" trade secrets claimed are [redacted].

Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *Hotel 71 Mezz Lender LLC v. National Retirement Fund*, 778 F.3d 593, 601 (7th Cir. 2015). "A genuine issue of material fact exists only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quotations marks and citations omitted). "On cross-motions for summary judgment, all facts and inferences are drawn in the light most favorable to the nonmoving party on each motion." *Id.*

**Defendants' Motion**

On defendants' motion for summary judgment, since plaintiff bears the ultimate burden of persuasion to establish its claims, the initial burden of production is on defendants "to inform the district court why a trial is not necessary." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (citation omitted). Defendant's initial burden may be discharged by pointing out to the court that there is an absence of evidence to support the plaintiff's case. *Id.* Once defendant makes such a showing, plaintiff must demonstrate that there is evidence upon which a factfinder could find in plaintiff's favor. *Id.*, at 1169. Plaintiff need not "persuade the court that [its] case is convincing; [it] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact" by presenting "definite, competent evidence to rebut the motion." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019).

The DTSA provides:

> (a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of

anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly–
(1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;
(2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;
(3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;
(4) attempts to commit any offense described in paragraphs (1) through (3); or
(5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy,
shall, except as provided in subsection (b), be fined under this title or imprisoned not more than 10 years, or both.[3]
18 U.S.C. § 1832(a)

The DTSA (18 U.S.C. § 1839) provides the following applicable definitions:

(3) the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if–
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

\*\*\*

(5) the term "misappropriation" means--
> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who--
>> (i) used improper means to acquire knowledge of the trade secret;

---

[3] The DTSA is a criminal statute, but it provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

>> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--
>> > (I) derived from or through a person who had used improper means to acquire the trade secret;
>> > (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>> > (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>> (iii) before a material change of the position of the person, knew or had reason to know that--
>> > (I) the trade secret was a trade secret; and
>> > (II) knowledge of the trade secret had been acquired by accident or mistake;
>
> (6) the term "improper means"--
> > (A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and
> > (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition;

The ITSA provides:

> (a) "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means. Reverse engineering or independent development shall not be considered improper means.
> (b) "Misappropriation" means:
> > (1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or
> > (2) disclosure or use of a trade secret of a person without express or implied consent by another person who:
> > > (A) used improper means to acquire knowledge of the trade secret; or
> > > (B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:
> > > > (I) derived from or through a person who utilized improper means to acquire it;
> > > > (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> > > > (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> > > (C) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.
>
> \*\*\*

5

(d) "Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2

The DTSA and ITSA are analyzed together because the pertinent definitions of the two acts overlap. *AptarGroup, Inc. v. Chamulak*, No. 18 C 50328, 2019 WL 2425175, * 4 (N.D. Ill. June 10, 2019). To prove a trade secret misappropriation claim, plaintiff must show that the information at issue was a trade secret and that it was misappropriated. *Id.*

"Under federal law, information qualifies as a 'trade secret' if (1) the owner thereof has taken reasonable measures to keep such information secret and (2) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. 18 U.S.C. § 1839(3). Illinois's definition is materially identical. 765 ILCS 1065/2(d)." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540 (7th Cir. 2021) (quotation marks and citations omitted). "Under both statutes, whether information qualifies as a trade secret is a question of fact that requires an ad hoc evaluation of all the surrounding circumstances." *Id.* (citation omitted).

"Although the existence of a trade secret is a question of fact, there are some general rules that guide the inquiry." *Id.* "[I]nformation that is public knowledge or that is generally known in an industry cannot be a trade secret. Thus, a company may not publicly disclose information in a patent and then claim that the information is a trade secret. Publication in a patent destroys the trade secret. Similarly, a company may not publicly sell or display a product and then claim trade secret protection in information that is 'readily ascertainable' upon examination of the product." *Id.* (quotation marks and citations omitted).

"Importantly, though, a limited disclosure does not destroy all trade secret protection in a product. Trade secret law focuses on the concrete secrets that the plaintiff seeks to protect, rather than broad areas of technology. Thus, a company can maintain trade secret protection in the undisclosed aspects of a product, even if it has publicly disclosed other aspects of the same product." *Id.* (quotation marks and citations omitted). "A trade secret can even exist in a combination of characteristics and components, each of which by itself, is in the public domain, so long as their unique combination has competitive value." *Id.* (quotation marks and citations omitted).

"By the same token, a company does not forfeit trade secret protection by publicly displaying or selling a product unless the trade secret is 'readily ascertainable' upon examination of the product. Restatement (Third) of Unfair Competition § 39 cmt. f. ('[I]f acquisition of the information through an examination of a competitor's product would be difficult, costly, or time-

consuming, the trade secret owner retains protection against an improper acquisition, disclosure, or use.')." *Id.* at 541 (citations omitted).

The court "focus[es] on the precise information that the plaintiff seeks to protect and ask[s] if it qualifies as a trade secret under the relevant statutory definition." *Id.* "[I]f it turns out that the precise information is known to the public, or is general knowledge in the industry, then there is no trade secret." *Id.* Ultimately, "whether information qualifies as a trade secret is a question of fact that requires an ad hoc evaluation of all the surrounding circumstances." *Id.* at 540 (citation omitted).

[First Trade Secret]

Plaintiff contends that the combination of elements in the [First Trade Secret] is a trade secret. Defendants contend the [First Trade Secret] is not a trade secret because plaintiff published the [First Trade Secret]. Defendants argue plaintiff's patent (US 7,025,684 B2) disclosed the use of [certain elements of the First Trade Secret] and that [certain elements of the First Trade Secret] were published by plaintiff on its website. Plaintiff admits that its website states that its CV Joints are [redacted], but it denies that the patent, or anything else discloses [the First Trade Secret].

Plaintiff's expert, Steven Becker, testified about [an element of the First Trade Secret] in his deposition. Dkt # 164-13. [Redacted] In creating specifications for parts like CV joints, it is typical to provide a [specification] for those parts. On the parts Becker worked on, the parts were [specified in a typical way]. *Id.* at 92 ff. A [part specified in that way] is easier to manufacture than a [part specified in the atypical way specified in the First Trade Secret]. Lentsch Dep. 2/10/21 Dkt # 164-5, p. 94 (Q. "[Y]ou knew that putting a [specification in the typical way], would be something that would be easier to manufacture. You knew that from your engineering experience; correct? A. Correct.")

The patent states:

> It will be readily apparent to those of ordinary skill in the art that various materials can be used for the parts of the joint 10, including the cage 14, whether the end portion 38 is of a different hardness or the same hardness as the rest of the cage 14. For example, the entire cage 14 could be constructed of a thru-hardening grade steel (e.g., 4340 (53 R.) steel), or other suitable material, or a carburizing grade steel (e.g., 8620 (60R) steel), or other suitable material, wherein the end portion 38 may be masked during carburizing. So it maintains a lesser hardness (e.g., 34-45 R) than the rest of the cage 14.

Dkt # 177-37, p. 7.

Defendants contend the patent's identification of [redacted][4], discloses the [claimed trade secret] because, according to defendants' expert, [the claimed trade secret] is "the [only thing] an engineer could reasonably specify [to obtain the desired outcome]." Dkt # 164-10, p. 20. However, plaintiff presents evidence that the identification of [redacted] in the patent does not disclose the [claimed trade secret].

---

[4] [Redacted]

7

According to Becker, disclosing a [redacted] does not disclose the [claimed trade secret]. The [typical specification] for a part is normally [different] than [the claimed trade secret]. As noted above, Becker testified the [redacted] for parts like CV joints he worked on was [the typical specification]. He testified plaintiff related to him '[that] they needed a [different specification] than typical to meet their performance requirements. And when I saw the [atypical specification], I asked them, you know, if they were nuts because nobody specifies that [atypical specification]. More commonly, it would be in, you know, a much [different specification]. I never worked with [ the atypical specification]." Dkt # 164-13, p. 96. In his report,[5] Becker states [redacted] (Dkt # 164-9, p.35) and "discloses [redacted]. The Patent does not disclose the [claimed trade secret]." Dkt # 164-9, p.36, n. 14. Thus, there is evidence that the patent does not disclose [the atypical specification] since there is evidence [parts are normally specified in the typical way]. For purposes of defendant's summary judgment motion, plaintiff has raised a genuine dispute of fact whether the patent discloses the [atypical specification].

Defendants contend that because the patent law requires a patent application to "set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention," 35 U.S.C. § 112, the use of [redacted] must be a disclosure of the [redacted] or plaintiff's patent application would violate the patent law. But the failure to disclose the best mode is not "a basis on which any claim of a patent may be canceled or held invalid or otherwise unenforceable" 35 U.S.C. § 282(b)(3)(A). Given this lack of effect on an issued patent, it is difficult to see how the Section 112 "best mode" requirement for a patent application compels the defeat of a trade secret claim. Defendant's have not cited any cases so holding.

Defendants also argue that plaintiff has disclosed the [First Trade Secret] to third parties without any confidentiality agreements requiring them to keep the [First Trade Secret] secret. Defendants contend plaintiff disclosed the [First Trade Secret] to [third parties] and that the [First Trade Secret] was developed by a third-party [developer], and that plaintiff has not produced any confidentiality agreements with [the third parties].

As to [the developer], plaintiff contends, based on the February 19, 2022, declaration of James Olson, a then-retired executive of plaintiff, that plaintiff had contacted [the developer] approximately 20 years ago to assist with product development. Dkt # 197-8, p. 2. At the outset of [the developer's] consulting relationship with plaintiff, [the developer] agreed to maintain the secrecy of the confidential information plaintiff disclosed to him. *Id.* Olson also believed [the developer] had executed a written confidentiality agreement at that time, but Olson was unable to locate a copy due to the lapse of time. *Id.*

As to the [other third parties], plaintiff argues there is no evidence in the record that it disclosed the [First Trade Secret to the other third parties]. The portion of Carlini's deposition defendants cite to support their claim plaintiff disclosed the [First Trade Secret] discusses only

---

[5] In a footnote in their reply brief, defendants object to plaintiff's reliance on Becker's expert report on the basis that the report is inadmissible hearsay since it "is not sworn testimony in the form of a declaration or affidavit." However, defense counsel questioned Becker extensively during his deposition about his expert report (which defense counsel had introduced as an exhibit to the deposition). Becker testified during the deposition that he wrote the subject expert report and there is no genuine dispute that his report could be submitted in a form that would be admissible at trial.

[one] prong of the [First Trade Secret]. Defendants have not pointed to any evidence that plaintiff disclosed the entire [First Trade Secret] to these [other third parties]. Plaintiff is not claiming that [the one prong] alone is a trade secret.

Moreover, plaintiff's obligation is to present evidence it took "reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A); 765 ILCS 1065/2(d)(2) ("efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality"). Plaintiff has presented evidence it sought to maintain the secrecy of the [First Trade Secret], and its other trade secrets, including limiting internal access to the information to only certain employees, requiring key employees to execute employment agreements with confidentiality provisions, maintaining the trade secret information in a server that is password protected with only certain employees having access, placing a conspicuous, written notation on its part drawings that identify the information as confidential and states it is not to be revealed to anyone else or reproduced or used for manufacture or any other purpose without first obtaining written permission from plaintiff,, shredding any documents containing any trade secret prior to their disposal, employing security cameras at is manufacturing facility, requiring third-parties, including vendors, to execute non-disclosure agreements before being provided with drawings showing trade secrets, and not allowing employees to retain or remove any trade secret information after the end of the employment relationship. Plaintiff's SOF, Dkt # 164, p.11-12.

Whether these measures were "reasonable measures" is a question for the jury. Whether plaintiff disclosed the [First Trade Secret] to [the other third parties] and did not obtain a written confidentiality agreement from them is a question for the jury. Whether [the developer] knew the [First Trade Secret] and whether he had a written confidentiality agreement is a question for the jury. Whether a lack of written confidentiality agreements from any or all of them means plaintiff did not take "reasonable measures to keep such information secret" is a question for the jury. For purposes of summary judgment, the lack of a written nondisclosure agreement from [the developer] and [the other third parties] does not establish plaintiff failed to take reasonable measures to keep the [First Trade Secret] secret.[6]

Defendants contend the [atypical specification] is readily ascertainable because it can be determined by purchasing a small set of parts (20-30) and conducting a simple [redacted] test on the set. However, defendant did not actually purchase 20 to 30 of plaintiff's CV joints and [perform such a] test them. It tested one part. The report from that test summarized that the cage of the CV joint was made from [redacted], the inner race was made from [redacted] and a [redacted], and the outer race was made from [redacted]. Dkt # 164-10, p. 74. This report is appended to the expert report of Frederick C. Kucklick, in which Kucklick opines that the [redacted] is "readily ascertainable by subjecting an exemplar part to [testing]" and then

---

[6] Plaintiff asserts it has a nondisclosure agreement with the [other third parties] and has submitted the nondisclosure agreement plaintiff entered with [redacted] which plaintiff asserts is the parent corporation of [the other third parties]. Dkt # 197-7. However, as defendant points out, the nondisclosure agreement is dated as of March 17, 2021, which is several years after the alleged initial misappropriations and has no bearing on the reasonableness of measures taken to keep the [First Trade Secret] secret during the time period relevant to this case.

summarizes the [report] as disclosing the cage and inner race being made of [redacted]." Report of Frederick Kucklick, 7/30/2021, Dkt # 164-10, p. 19.

It is only later, in Kucklick's declaration dated 1/25/2022, submitted with defendants' motion for summary judgment that the opinion is expressed that "[i]t would only take between 20-30 sample CV joints to determine the [redacted] of a specific CV joint." Dkt # 173, p. 8. The declaration provides no factual basis supporting the opinion that the [redacted] would be readily ascertainable from testing 20-30 parts nor any explanation as to how this opinion was reached. In their reply brief, defendants state that this 20–30-part test "is an alternative to simply applying the [redacted] that could be specified" and "is an extrapolation of the [analysis] that Kucklick conducted and disclosed in his report." Dkt # 202, p. 33. But as discussed above, plaintiff has presented evidence that [redacted] for CV joints are normally [the typical specification] so there is evidence that an engineer designing a CV joint would not apply [the specification defendants assert] to a [redacted] disclosed by the testing of one CV joint and, as just noted, there is no factual basis for why testing 20-30 CV joints would be enough to ascertain the [atypical specification]. Thus, there is evidence from which a jury could conclude the [atypical specification] is not readily ascertainable.

Defendants argue plaintiff never used the [First Trade Secret] stating "[n]ot a single design drawing includes the so-called [First Trade Secret] as recited." Dkt # 202, p. 6. However, plaintiff's January 13, 2021, Rule 26(a) disclosure produced two drawings containing the [First Trade Secret]. Dkt # 208, pp. 29, 32. The declaration of Sean Carlini, plaintiff's director of engineering, states plaintiff sells products that embody the [First Trade Secret] (along with the [First Secret Tolerance]). Dkt # 164-4, p. 8-12. Plaintiff has presented evidence from which a jury could conclude that plaintiff uses the [First Trade Secret].

Defendants contend that plaintiff has not produced evidence the [atypical specification] offers any competitive advantage with respect to its competitor's products. The statutory standard for a trade secret is that "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(B); 765 ILCS 1065/2(d)(1). The information plaintiff claims to be the trade secret is the [First Trade Secret] which includes the [atypical specification]. Plaintiff has presented evidence that the [First Trade Secret] was developed over many years at significant expense; that embodying the [First Trade Secret] in its RCV Performance CV Joints has enabled these CV joints to be sold profitably; that the development of the [atypical specification] involved trial and error which revealed that a CV joint with a [certain specification] would fail in the environment intended for these CV joints. Dkt # 164-4, pp. 8-12. As noted above, Becker testified that the [redacted] of CV joints he worked on was [the typical specification]. Becker found the [First Trade Secret] "is contrary to sources external to [plaintiff] (public) of information about typical CV [manufacturing]." Dkt # 164-9, p. 6-7. Kucklick testified in his deposition that he did not find another CV joint manufacturer that used the [First Trade Secret]. Dkt # 164-21, pp. 82-86. This is evidence from which a jury could conclude that the [First Trade Secret] (with its [atypical specification]) has independent actual or potential economic value from not being known by another CV joint manufacturer.

The Tolerances

Defendants argue plaintiff's [First Secret Tolerance] and its [Second Secret Tolerance] are not trade secrets.[7] As to the [First Secret Tolerance], defendants contend that the tolerances are typical tolerances used for CV joints, that there are many acceptable tolerances for the [redacted] of a CV joint cage and that plaintiff has failed to demonstrate that the asserted [First Secret Tolerance] has independent economic value.

Defendants admit that plaintiff uses [the First Secret Tolerance] in at least one of its CV joints, that plaintiff's use of this tolerance is not generally known in the industry, and that the [First Secret Tolerance] cannot be readily reverse engineered. Dkt # 188, p.31-32. Defendants did not identify another CV joint manufacturer that uses [the First Secret Tolerance]. *Id.* at 28. Instead, defendants contend that the [First Secret Tolerance] is a typical tolerance for use in CV joint design. They point to evidence that plaintiff uses different [redacted] tolerances in different joints and to two publications to support their position that the [First Secret Tolerance] is typical. Defendants argue plaintiff has presented no evidence that tolerances in isolation would have any value to a competitor and that plaintiff has not discovered a universal [redacted] tolerance.

Plaintiff presents evidence that the [First Secret Tolerance] for its RCV Performance CV Joints was costly and time consuming to develop; that plaintiff experimented with numerous different [redacted] tolerances for more than a year before it established the [First Secret Tolerance]; that after preliminarily identifying the [First Secret Tolerance] through trial and error, it experimented with that and other tolerances for the [redacted] dimension, in combination with experimenting with other manufacturing specifications in order to ultimately arrive upon a complete design using the [First Secret Tolerance] that would perform appropriately along with the other manufacturing specifications for its RCV Performance CV Joints. Dkt # 164-4, p. 10. The [First Secret Tolerance], along with the [First Trade Secret], are embodied in the RCV Performance CV Joints, which generate significant sales revenue for plaintiff. *Id.* at 8. This is evidence from which a jury could conclude that the [First Secret Tolerance] in a high-performance CV joint cage is a trade secret. Whether this tolerance in this application is generally known in the industry, derives independent economic value, actual or potential from not being generally known, or can be readily ascertained through proper means is for the jury to decide.

As to the [Second Secret Tolerance], defendants argue that the [Second Secret Tolerance] is merely the application of general skills and knowledge rendering the tolerance readily ascertainable within the industry and that plaintiff has presented no evidence that tolerances in isolation would have any value to a competitor. Plaintiff argues Becker's report demonstrates that plaintiff's [Second Secret Tolerance] is not commonly known in the industry. Becker's report states plaintiff's specific tolerances do not appear in general geometric dimensioning and tolerancing reference materials and are not determinable by reverse engineering. Plaintiff has presented enough evidence to create a disputed issue of fact to be resolved by the jury.

---

[7] Plaintiff has abandoned its claims that defendants misappropriated trade secrets for its inner diameter and outer diameter dimensional tolerances. Dkt # 196, p. 5.

11

The [Specifically Described Component]

Defendants argue the [Specifically Described Component] is not a trade secret. They argue that the [component] of a CV joint can be easily measured and that a German patent disclosed a [Specifically Described Component] for a CV joint. In its answer to defendants' statement of facts, plaintiff admits that the [component] of an actual individual CV joint can be measured by using a [testing device] but denies that the manufacturing specifications of a CV joint's [component] can be reverse engineered by measuring a single CV joint. Dkt # 917, p. 10. Plaintiff also admits that German patent DE 2013 104 065, published October 23, 2014 ("German Patent"), discloses [a component] for a CV joint [redacted]. *Id.* at p.11.

Defendants' brief argues both that the use of a [Specifically Described Component] is easily discernable by inspection and that the use of a [Specifically Described Component] is publicly disclosed in the German Patent and, therefore, is generally known and not a trade secret. Plaintiff argues that whether the [Specifically Described Component] is a trade secret is a disputed issue of fact. It cites Becker's report for the proposition that the [Specifically Described Component] was subject to reasonable confidentiality efforts and cannot be readily duplicated. However, plaintiff makes no argument that the German Patent does not make the [Specifically Described Component] generally known. A failure to offer any opposition to an argument constitutes a waiver. *Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007). Plaintiff has waived its argument that the [Specifically Described Component] is not generally known based on the published German Patent. Defendants are entitled to summary judgment on plaintiff's claimed [Specifically Described Component] trade secret.

Combination Trade Secrets

Plaintiff also claims defendants misappropriated certain "combination" trade secrets (things that are trade secrets when used in combination with one or more of the "stand-alone" trade secrets). The "combination" trade secrets claimed are [redacted]. Plaintiff admits it has published its use of [redacted] on its website. Plaintiff argues that the combination of any of these with the stand-alone trade secrets—the [First Trade Secret], the [First Secret Tolerance], the [Second Secret Tolerance] or the [Specifically Described Component], however, is not publicly known.

Defendants argue plaintiff's claim to combination trade secrets fails for lack of specificity in describing precisely which combinations are claimed to be trade secrets. Plaintiff argues that "Becker's Report amply demonstrates that [plaintiff's] other specifications that are not stand-alone trade secrets qualify as trade secrets in combination with [plaintiff's] stand-alone trade secrets." Dkt # 196, p. 10. However, plaintiff does not cite to a specific paragraph of an LR56.1 statement or response or to any specific portions of Becker's Report to support this argument so it will not be considered.[8] LR56.1(g) Plaintiff also cites to Kucklick's deposition where Kucklick acknowledges that because he could not identify another manufacturer that used the [First Trade Secret], that he also could not identify another manufacturer who used the [First

---

[8] Even if the court considered this argument, it is not clear from Becker's report that Becker concludes the above listed combination trade secrets (other than the inclusion of [redacted] in the [First Trade Secret]) are trade secrets.

Trade Secret] in combination with any of the other specifications plaintiff identifies as combination trade secrets. Dkt # 164-21, pp. 84-86. Kucklick's deposition admission does not on its own establish that the purported combination trade secrets are trade secrets. The testimony only admits the obvious, that if he did not find another manufacturer that used the [First Trade Secret], he could not have found a manufacturer that used the [First Trade Secret] along with something else.

Defendants are entitled to summary judgment on plaintiff's claimed combination trade secrets.

Misappropriation

Defendants argue there is no evidence of misappropriation. They contend that there is no evidence that Lentsch took any documents or other information from plaintiff when he left. Defendants maintain Lentsch only applied general skill and knowledge in preparing the Five Part Drawings. Defendants observe that plaintiff does not claim Lentsch copied a specific CV joint plaintiff had designed and merely speculates that Lentsch memorized certain information.

Plaintiff argues that there is evidence that Lentsch memorized the [First Trade Secret]. Lentsch testified in his February 10, 2021, deposition, that when he prepared the Five Part Drawings, he knew that plaintiff specified [the First Trade Secret]. Dkt # 164-5, p. 93. He testified he knew that a [typical specification] would be easier to manufacture, but he selected [the atypical specification] "[b]ecause he recalled that [the atypical specification] produced favorable results when testing." *Id.* at 94. He testified that when he prepared the Five Part Drawings, he had no experience other than at plaintiff for [redacted] testing for CV joint technology and he knew from his experience at plaintiff that plaintiff specified parts with [the atypical specification] because he knew that recipe made strong parts. *Id.* at 95-96. This is evidence from which a jury could conclude that Lentsch misappropriated the [First Trade Secret].

Defendants point to Lentsch's testimony in his prior deposition on October 10, 2019, where he testified that he did not specifically remember that plaintiff used [the atypical specification] for its CV joints. He testified he remembered it was [a specification]; he found publicly available documentation online that [a certain specification was effective]; that he did not want to [vary that specification too much] because [it might become ineffective]; but he did not know where he got the [specification he chose] from. Dkt #164-2, pp. 179-80. But this conflict in testimony is for the jury to resolve.

Defendants argue there is no evidence of misappropriation of the [First Secret Tolerance or Second Secret Tolerance]. They argue there is no evidence Lentsch possessed any document containing either of these trade secrets nor has plaintiff produced any testimonial or other evidence that Lentsch took this information. Defendants maintain that the only evidence plaintiff proffered is that Lentsch had access to these trade secrets when he worked for plaintiff and contend access is not enough to show misappropriation. However, Becker's report finds that most of the dimension tolerances contained in the Five Part drawings are not consistent with standard machine operation tolerances and have numerous characteristics consistent with either copying or memorizing several of plaintiff's drawing features. Dkt # 164-9, p.42. The Becker report finds both plaintiff's and Lentsch's cage drawings have the same [First Secret Tolerance] and [Second Secret Tolerance]. Lentsch confirmed these tolerances were the same in his October

13

10, 2019, deposition. Dkt # 164-2 pp. 199, 207. Plaintiff has presented enough evidence to create a disputed issue of fact to be resolved by the jury.

Defendants argue they are entitled to summary judgment because plaintiff has suffered nothing more than *de minimis* harm from the alleged misappropriation. In response plaintiff correctly points out that both the DTSA (18 U.S.C. § 1836(b)(3)(B)(ii)) and the ITSA (765 ILCS 1065/4(a)) provide for damages in the form of a reasonable royalty where plaintiff suffers from misappropriation of its trade secrets but is unable to prove damages by other methods, so at a minimum, plaintiff is entitled to such a royalty. Defendants do not offer any opposition to this argument in their reply brief and, therefore, have waived any argument that 18 U.S.C. § 1836(b)(3)(B)(ii)) and 765 ILCS 1065/4(a) do not provide a basis for plaintiff being harmed by the alleged misappropriation. *Wojtas*, 477 F.3d at 926.

### The Contract

Lentsch moves for summary judgment on plaintiff's breach of contract claims arguing that plaintiff cannot show that the confidentiality provisions of his employment contract are enforceable, that Lentsch breached the agreement, or that plaintiff was harmed by Lentsch's conduct. In its order [92] denying Lentsch's motion to dismiss plaintiff's contract claims the court stated: "Under Illinois law, a restrictive covenant, ancillary to a valid employment relationship, 'is reasonable only if the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public.' *Reliable Fire Equipment Co.v. Arredondo,* 965 N.E.2d 393, 396 (Ill. 2011). 'Each case must be determined on its own particular facts. Reasonableness is gauged not just by some but by all of the circumstances. The same identical contract and restraint may be reasonable and valid under one set of circumstances, and unreasonable and invalid under another set of circumstances.' Id. at 403. The court concluded its opinion as follows: "Under *Reliable Fire*, the totality of the circumstances will need to be considered to determine whether the restrictive covenants contained in the Agreement are enforceable. Whether the definition of Confidential Information is overbroad, whether any overbreadth in the definition renders unprotectable information that would on its own be validly protectable, and whether the severability provision applies to 'blue-pencil' the Agreement will depend on the totality of the circumstances."

Despite the court pointing out the standard that had to be applied, the parties do not cite *Reliable Fire* or present argument applying *Reliable Fire's* "totality of the circumstances" test in their briefs. Lentsch bears the initial burden on summary judgment to show there is an absence of evidence to support plaintiff's case. *Modrowski*, 712 F.3d at 1168. By failing to advance an argument applying *Reliable Fire's* "totality of the circumstances" test to the facts, Lentsch has failed to meet this burden.

Lentsch argues that even if the confidentiality provisions of the contract are enforceable, plaintiff has failed to show harm under the contract. However, as plaintiff points out (Dkt # 196, p.18) a reasonable royalty is recoverable for a breach of a confidentiality agreement as it is under DTSA and ITSA as noted above. See V*ojdani v. Pharmasan Labs ,Inc.*, 741 F.3d 777 (7th Cir. 2013). The agreement also allows for injunctive relief, costs and expenses and attorneys' fees, which plaintiff is seeking.

Lentsch is not entitled to summary judgment on the contract claims.

**Plaintiff's Motion**

On plaintiff's motion, since plaintiff bears the ultimate burden of persuasion to establish its claims, to succeed plaintiff "must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71*, 778 F.3d at 601. "On cross-motions for summary judgment, all facts and inferences are drawn in the light most favorable to the nonmoving party on each motion." *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). If the summary judgment movant bears the burden of proof at trial, he can prevail only by proving each element of his case with evidence sufficiently compelling that no reasonable jury could find for the nonmovant. *McKinney v. American River Transp. Co*., 954 F. Supp.2d 799, 803 (S.D. Ill. 2013).

Plaintiff argues it is entitled to summary judgment as to defendants' liability for misappropriating the [First Trade Secret] and the [First Secret Tolerance]. However, it has failed to prove each element of its case with evidence sufficiently compelling that no reasonable jury could find for defendant. *Id.*

Plaintiff is required to prove misappropriation. However, there is a question of fact as to whether Lentsch misappropriated plaintiff's [First Secret Tolerance]. There is evidence that Lentsch did not take or possess any documents containing plaintiff's [First Secret Tolerance] (or any other trade secret) when and after he left plaintiff's employ. No documents containing the purported trade secrets were found by a forensic search of Lentsch's devices and he denies taking or possessing any such documents. There is no direct evidence Lentsch knew plaintiff used the specified [First Secret Tolerance] in its CV joints. Plaintiff's evidence of misappropriation of the [First Secret Tolerance] depends on drawing an inference in plaintiff's favor. Becker reviewed the Five Part Drawings and certain of plaintiff's drawings. He found that the dimension tolerances were not consistent with standard machine tolerances and had numerous characteristics consistent with either copying or memorizing several of plaintiff's drawing features. Dkt # 164-9, p. 42. He inferred misappropriation from the drawings' similarities. Since inferences must be drawn in defendants' favor on plaintiff's summary judgment motion, the inference of misappropriation cannot be drawn in plaintiff's favor. Plaintiff has not proven that no reasonable jury could find for defendants on the question of misappropriation of the [First Secret Tolerance]. Plaintiff is not entitled to summary judgment as to the [First Secret Tolerance] because it has not proven the misappropriation element of its trade secret claim.

Plaintiff must prove reasonable measures were taken to maintain the secrecy of its alleged trade secrets. Plaintiff has set forth evidence of measures it took to maintain the secrecy of its trade secrets, including the use of non-disclosure agreements with third parties. As to the [First Trade Secret], defendants have raised plaintiff's failure to produce nondisclosure agreements with [third parties] as evidence plaintiff did not take reasonable measures to maintain the secrecy of the [First Trade Secret]. Whether plaintiff disclosed the [First Trade Secret] to [third parties] is a question of fact for the jury. Whether plaintiff failed to obtain written confidentiality agreements from them is a question of fact for the jury. Whether failure to obtain a written confidentiality agreement from the [third parties] proves plaintiff did not take "reasonable measures to keep such information secret" is a question of fact for the jury. Likewise, whether [the developer] knew the [First Trade Secret], whether he had a written

15

confidentiality agreement, and whether lack of a written confidentiality agreement proves plaintiff did not take "reasonable measures to keep such information secret" is a question of fact for the jury. Plaintiff has not proven that no reasonable jury could find for defendants on the question whether plaintiff has taken reasonable measures to protect the secrecy of the [First Trade Secret]. Plaintiff is not entitled to summary judgment as to the [First Trade Secret] because it has not proven the "reasonable measures" element of its trade secrets claim.

Because the failure to prove these elements of plaintiff's trade secrets claims are enough to defeat plaintiff's motion for summary judgment, the court need not examine whether there are additional bases that preclude summary judgment for plaintiff.

<u>Defendants" Expert</u>

In its brief in support of its motion for summary judgment, plaintiff argues defendant's expert, Frederick Kucklick, is not qualified to testify as an expert on CV joint technology and, therefore, that his opinions cannot raise a genuine issue of material fact. Plaintiff argues that Kucklick admits he has no experience designing a CV joint, reverse engineering a CV joint, manufacturing a CV joint or testing a CV joint. Kucklick has never authored a publication on CV joint design. Defendants do not respond to plaintiff's argument that Kucklick is not qualified to serve as an expert on CV joint technology. A failure to offer any opposition to an argument constitutes a waiver. *Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007). Accordingly, the court has not relied on any of Kucklick's opinions in ruling in favor of defendants on any issues presented in the summary judgment motions.

For the foregoing reasons, plaintiff's motion [160] for partial summary judgment is denied. Defendants' motion [165] for summary judgment is granted in part and denied in part. Plaintiff has abandoned its claims under the state law tort theories set forth in Counts V, VI, VII, and VIII and summary judgment is granted in defendants' favor on plaintiff's claims under those tort theories. Defendants' motion is granted as set forth in the opinion as to two of plaintiff's claimed trade secrets and denied as to plaintiff's other claimed trade secrets. Defendants' motion as to plaintiff's breach of contract claim is denied. The parties are directed to confer and jointly propose redactions to this opinion by October 12, 2022. The parties are directed to consult with Magistrate Judge Jensen concerning potential settlement of this case and case No. 22 C 50048, Amalga Composites v. Aircraft Gear Corporation. The court acknowledges prior settlement efforts, but new efforts may be fruitful due to the change in posture of this case.

Date: 9/29/2022  ENTER:

_____
United States District Court Judge

Electronic Notices.